*132 Justice Kennedy
delivered the opinion of the Court.
These cases require us to consider the validity of the Partial-Birth Abortion Ban Act of 2003 (Act), 18 U. S. C. § 1531 (2000 ed., Supp. IV), a federal statute regulating abortion procedures. In recitations preceding its operative provisions the Act refers to the Court’s opinion in Stenberg v. *133 Carhart, 530 U. S. 914 (2000), which also addressed the subject of abortion procedures used in the later stages of pregnancy. Compared to the state statute at issue in Stenberg, the Act is more specific concerning the instances to which it applies and in this respect more precise in its coverage. We conclude the Act should be sustained against the objections lodged by the broad, facial attack brought against it.
In No. 05-380 (Carhart) respondents are LeRoy Carhart, William G. Fitzhugh, William H. Knorr, and Jill L. Vibhakar, doctors who perform second-trimester abortions. These doctors filed their complaint against the Attorney General of the United States in the United States District Court for the District of Nebraska. They challenged the constitutionality of the Act and sought a permanent injunction against its enforcement. Carhart v. Ashcroft, 331 F. Supp. 2d 805 (2004). In 2004, after a 2-week trial, the District Court granted a permanent injunction that prohibited the Attorney General from enforcing the Act in all cases but those in which there was no dispute the fetus was viable. Id., at 1048. The Court of Appeals for the Eighth Circuit affirmed. 413 F. 3d 791 (2005). We granted certiorari. 546 U. S. 1169 (2006).
In No. 05-1382 (Planned Parenthood) respondents are Planned Parenthood Federation of America, Inc., Planned Parenthood Golden Gate, and the City and County of San Francisco. The Planned Parenthood entities sought to enjoin enforcement of the Act in a suit filed in the United States District Court for the Northern District of California. Planned Parenthood Federation of Am. v. Ashcroft, 320 F. Supp. 2d 957 (2004). The City and County of San Francisco intervened as a plaintiff. In 2004, the District Court held a trial spanning a period just short of three weeks, and it, too, enjoined the Attorney General from enforcing the Act. Id., at 1035. The Court of Appeals for the Ninth Circuit affirmed. 435 F. 3d 1163 (2006). We granted certiorari. 547 U. S. 1205 (2006).
*134 I
A
The Act proscribes a particular manner of ending fetal life, so it is necessary here, as it was in Stenberg, to discuss abortion procedures in some detail. Three United States District Courts heard extensive evidence describing the procedures. In addition to the two courts involved in the instant cases the District Court for the Southern District of New York also considered the constitutionality of the Act. National Abortion Federation v. Ashcroft, 330 F. Supp. 2d 436 (2004). It found the Act unconstitutional, id., at 493, and the Court of Appeals for the Second Circuit affirmed, National Abortion Federation v. Gonzales, 437 F. 3d 278 (2006). The three District Courts relied on similar medical evidence; indeed, much of the evidence submitted to the Carhart court previously had been submitted to the other two courts. 331 F. Supp. 2d, at 809-810. We refer to the District Courts’ exhaustive opinions in our own discussion of abortion procedures.
Abortion methods vary depending to some extent on the preferences of the physician and, of course, on the term of the pregnancy and the resulting stage of the unborn child’s development. Between 85 and 90 percent of the approximately 1.3 million abortions performed each year in the United States take place in the first three months of pregnancy, which is to say in the first trimester. Planned Parenthood, supra, at 960, and n. 4; App. in No. 05-1382, pp. 45-48. The most common first-trimester abortion method is vacuum aspiration (otherwise known as suction curettage) in which the physician vacuums out the embryonic tissue. Early in this trimester an alternative is to use medication, such as mifepristone (commonly known as RU-486), to terminate the pregnancy. National Abortion Federation, supra, at 464, n. 20. The Act does not regulate these procedures.
*135 Of the remaining abortions that take place each year, most occur in the second trimester. The surgical procedure referred to as “dilation and evacuation” or “D&E” is the usual abortion method in this trimester. Planned Parenthood, supra, at 960-961. Although individual techniques for performing D&E differ, the general steps are the same.
A doctor must first dilate the cervix at least to the extent needed to insert surgical instruments into the uterus and to maneuver them to evacuate the fetus. National Abortion Federation, supra, at 465; App. in No. 05-1382, at 61. The steps taken to cause dilation differ by physician and gestational age of the fetus. See, e. g., Carhart, supra, at 852, 856, 859, 862-865, 868, 870, 873-874, 876-877, 880, 883, 886. A doctor often begins the dilation process by inserting osmotic dilators, such as laminaria (sticks of seaweed), into the cervix. The dilators can be used in combination with drugs, such as misoprostol, that increase dilation. The resulting amount of dilation is not uniform, and a doctor does not know in advance how an individual patient will respond. In general the longer dilators remain in the cervix, the more it will dilate. Yet the length of time doctors employ osmotic dilators varies. Some may keep dilators in the cervix for two days, while others use dilators for a day or less. National Abortion Federation, supra, at 464-465; Planned Parenthood, supra, at 961.
After sufficient dilation the surgical operation can commence. The woman is placed under general anesthesia or conscious sedation. The doctor, often guided by ultrasound, inserts grasping forceps through the woman’s cervix and into the uterus to grab the fetus. The doctor grips a fetal part with the forceps and pulls it back through the cervix and vagina, continuing to pull even after meeting resistance from the cervix. The friction causes the fetus to tear apart. For example, a leg might be ripped off the fetus as it is pulled through the cervix and out of the woman. The process of *136 evacuating the fetus piece by piece continues until it has been completely removed. A doctor may make 10 to 15 passes with the forceps to evacuate the fetus in its entirety, though sometimes removal is completed with fewer passes. Once the fetus has been evacuated, the placenta and any remaining fetal material are suctioned or scraped out of the uterus. The doctor examines the different parts to ensure the entire fetal body has been removed. See, e. g., National Abortion Federation, supra, at 465; Planned Parenthood, 320 F. Supp. 2d, at 962.
Some doctors, especially later in the second trimester, may kill the fetus a day or two before performing the surgical evacuation. They inject digoxin or potassium chloride into the fetus, the umbilical cord, or the amniotic fluid. Fetal demise may cause contractions and make greater dilation possible. Once dead, moreover, the fetus’ body will soften, and its removal will be easier. Other doctors refrain from injecting chemical agents, believing it adds risk with little or no medical benefit. Carhart, supra, at 907-912; National Abortion Federation, supra, at 474-475.
The abortion procedure that was the impetus for the numerous bans on “partial-birth abortion,” including the Act, is a variation of this standard D&E. See M. Haskell, Dilation and Extraction for Late Second Trimester Abortion (1992), 1 Appellant’s App. in No. 04-3379 (CA8), p. 109 (hereinafter Dilation and Extraction). The medical community has not reached unanimity on the appropriate name for this D&E variation. It has been referred to as “intact D&E,” “dilation and extraction” (D&X), and “intact D&X.” National Abortion Federation, supra, at 440, n. 2; see also F. Cunningham et al., Williams Obstetrics 243 (22d ed. 2005) (identifying the procedure as D&X); Danforth’s Obstetrics and Gynecology 567 (J. Scott, R. Gibbs, B. Karlan, & A. Haney eds. 9th ed. 2003) (identifying the procedure as intact D&X); M. Paul, E. Lichtenberg, L. Borgatta, D. Grimes, & P. Stubblefield, A Clinician’s Guide to Medical and Surgical *137 Abortion 136 (1999) (identifying the procedure as intact D&E). For discussion purposes this D&E variation will be referred to as intact D&E. The main difference between the two procedures is that in intact D&E a doctor extracts the fetus intact or largely intact with only a few passes. There are no comprehensive statistics indicating what percentage of all D&Es are performed in this manner.
Intact D&E, like regular D&E, begins with dilation of the cervix. Sufficient dilation is essential for the procedure. To achieve intact extraction some doctors thus may attempt to dilate the cervix to a greater degree. This approach has been called “serial” dilation. Carhart, 331 F. Supp. 2d, at 856, 870, 873; Planned Parenthood, supra, at 965. Doctors who attempt at the outset to perform intact D&E may dilate for two full days or use up to 25 osmotic dilators. See, e. g., Dilation and Extraction 110; Carhart, supra, at 865, 868, 876, 886.
In an intact D&E procedure the doctor extracts the fetus in a way conducive to pulling out its entire body, instead of ripping it apart. One doctor, for example, testified:
“If I know I have good dilation and I reach in and the fetus starts to come out and I think I can accomplish it, the abortion with an intact delivery, then I use my forceps a little bit differently. I don’t close them quite so much, and I just gently draw the tissue out attempting to have an intact delivery, if possible.” App. in No. 05-1382, at 74.
Rotating the fetus as it is being pulled decreases the odds of dismemberment. Carhart, supra, at 868-869; App. in No. 05-380, pp. 40-41; 5 Appellant’s App. in No. 04-3379 (CA8), at 1469. A doctor also “may use forceps to grasp a fetal part, pull it down, and re-grasp the fetus at a higher level — sometimes using both his hand and a forceps — to exert traction to retrieve the fetus intact until the head is lodged in the [cervix].” Carhart, supra, at 886-887.
*138 Intact D&E gained public notoriety when, in 1992, Dr. Martin Haskell gave a presentation describing his method of performing the operation. Dilation and Extraction 110-111. In the usual intact D&E the fetus’ head lodges in the cervix, and dilation is insufficient to allow it to pass. See, e. g., ibid,.; App. in No. 05-380, at 577; App. in No. 05-1382, at 74, 282. Haskell explained the next step as follows:
“ At this point, the right-handed surgeon slides the fingers of the left [hand] along the back of the fetus and “hooks” the shoulders of the fetus with the index and ring fingers (palm down).
“ ‘While maintaining this tension, lifting the cervix and applying traction to the shoulders with the fingers of the left hand, the surgeon takes a pair of blunt curved Metzenbaum scissors in the right hand. He carefully advances the tip, curved down, along the spine and under his middle finger until he feels it contact the base of the skull under the tip of his middle finger.
“ ‘[T]he surgeon then forces the scissors into the base of the skull or into the foramen magnum. Having safely entered the skull, he spreads the scissors to enlarge the opening.
“‘The surgeon removes the scissors and introduces a suction catheter into this hole and evacuates the skull contents. With the catheter still in place, he applies traction to the fetus, removing it completely from the patient.’ ” H. R. Rep. No. 108-58, p. 3 (2003).
This is an abortion doctor’s clinical description. Here is another description from a nurse who witnessed the same method performed on a 26-week fetus and who testified before the Senate Judiciary Committee:
“‘Dr. Haskell went in with forceps and grabbed the baby’s legs and pulled them down into the birth canal. Then he delivered the baby’s body and the arms — every *139 thing but the head. The doctor kept the head right inside the uterus....
“ ‘The baby’s little fingers were clasping and unclasping, and his little feet were kicking. Then the doctor stuck the scissors in the back of his head, and the baby’s arms jerked out, like a startle reaction, like a flinch, like a baby does when he thinks he is going to fall.
“‘The doctor opened up the scissors, stuck a high-powered suction tube into the opening, and sucked the baby’s brains out. Now the baby went completely limp... .
“ ‘He cut the umbilical cord and delivered the placenta. He threw the baby in a pan, along with the placenta and the instruments he had just used.’” Ibid.
Dr. Haskell's approach is not the only method of killing the fetus once its head lodges in the cervix, and “the process has evolved” since his presentation. Planned Parenthood, 320 F. Supp. 2d, at 965. Another doctor, for example, squeezes the skull after it has been pierced “so that enough brain tissue exudes to allow the head to pass through.” App. in No. 05-380, at 41; see also Carhart, 331 F. Supp. 2d, at 866-867, 874. Still other physicians reach into the cervix with their forceps and crush the fetus’ skull. Id., at 858, 881. Others continue to pull the fetus out of the woman until it disarticulates at the neck, in effect decapitating it. These doctors then grasp the head with forceps, crush it, and remove it. Id., at 864, 878; see also Planned Parenthood, supra, at 965.
Some doctors performing an intact D&E attempt to remove the fetus without collapsing the skull. See Carhart, supra, at 866, 869. Yet one doctor would not allow delivery of a live fetus younger than 24 weeks because “the objective of [his] procedure is to perform an abortion,” not a birth. App. in No. 05-1382, at 408-409. The doctor thus answered in the affirmative when asked whether he would “hold the fetus’ head on the internal side of the [cervix] in order to *140 collapse the skull” and kill the fetus before it is born. Id., at 409; see also Carhart, supra, at 862, 878. Another doctor testified he crushes a fetus’ skull not only to reduce its size but also to ensure the fetus is dead before it is removed. For the staff to have to deal with a fetus that has “some viability to it, some movement of limbs,” according to this doctor, “[is] always a difficult situation.” App. in No. 05-380, at 94; see Carhart, supra, at 858.
D&E and intact D&E are not the only second-trimester abortion methods. Doctors also may abort a fetus through medical induction. The doctor medicates the woman to induce labor, and contractions occur to deliver the fetus. Induction, which unlike D&E should occur in a hospital, can last as little as 6 hours but can take longer than 48. It accounts for about 5 percent of second-trimester abortions before 20 weeks of gestation and 15 percent of those after 20 weeks. Doctors turn to two other methods of second-trimester abortion, hysterotomy and hysterectomy, only in emergency situations because they carry increased risk of complications. In a hysterotomy, as in a cesarean section, the doctor removes the fetus by making an incision through the abdomen and uterine wall to gain access to the uterine cavity. A hysterectomy requires the removal of the entire uterus. These two procedures represent about 0.07 percent of second-trimester abortions. National Abortion Federation, 330 F. Supp. 2d, at 467; Planned Parenthood, supra, at 962-963.
B
After Dr. Haskell’s procedure received public attention, with ensuing and increasing public concern, bans on “ ‘partial birth abortion’ ” proliferated. By the time of the Stenberg decision, about 30 States had enacted bans designed to prohibit the procedure. 530 U. S., at 995-996, and nn. 12-13 (Thomas, J., dissenting); see also H. R. Rep. No. 108-58, at 4-5. In 1996, Congress also acted to ban partial-birth abortion. President Clinton vetoed the congressional legis *141 lation, and the Senate failed to override the veto. Congress approved another bill banning the procedure in 1997, but President Clinton again vetoed it. In 2003, after this Court’s decision in Stenberg, Congress passed the Act at issue here. H. R. Rep. No. 108-58, at 12-14. On November 5, 2003, President Bush signed the Act into law. It was to take effect the following day. 18 U. S. C. § 1531(a) (2000 ed., Supp. IV).
The Act responded to Stenberg in two ways. First, Congress made factual findings. Congress determined that this Court in Stenberg “was required to accept the very questionable findings issued by the district court judge,” §2(7), 117 Stat. 1202, notes following 18 U. S. C. § 1531 (2000 ed., Supp. IV), p. 768, ¶ (7) (hereinafter Congressional Findings), but that Congress was “not bound to accept the same factual findings,” id., ¶ (8). Congress found, among other things, that “[a] moral, medical, and ethical consensus exists that the practice of performing a partial-birth abortion ... is a gruesome and inhumane procedure that is never medically necessary and should be prohibited.” Id., ¶ (1).
Second, and more relevant here, the Act’s language differs from that of the Nebraska statute struck down in Stenberg. See 530 U. S., at 921-922 (quoting Neb. Rev. Stat. Ann. §§28-328(1), 28-326(9) (Supp. 1999)). The operative provisions of the Act provide in relevant part:
“(a) Any physician who, in or affecting interstate or foreign commerce, knowingly performs a partial-birth abortion and thereby kills a human fetus shall be fined under this title or imprisoned not more than 2 years, or both. This subsection does not apply to a partial-birth abortion that is necessary to save the life of a mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself. This subsection takes effect 1 day after the enactment.
*142 “(b) As used in this section—
“(1) the term ‘partial-birth abortion’ means an abortion in which the person performing the abortion—
“(A) deliberately and intentionally vaginally delivers a living fetus until, in the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part of the fetal trunk past the navel is outside the body of the mother, for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus; and
“(B) performs the overt act, other than completion of delivery, that kills the partially delivered living fetus; and
“(2) the term ‘physician’ means a doctor of medicine or osteopathy legally authorized to practice medicine and surgery by the State in which the doctor performs such activity, or any other individual legally authorized by the State to perform abortions: Provided, however, That any individual who is not a physician or not otherwise legally authorized by the State to perform abortions, but who nevertheless directly performs a partial-birth abortion, shall be subject to the provisions of this section.
“(d)(1) A defendant accused of an offense under this section may seek a hearing before the State Medical Board on whether the physician’s conduct was necessary to save the life of the mother whose life was endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself.
“(2) The findings on that issue are admissible on that issue at the trial of the defendant. Upon a motion of the defendant, the court shall delay the beginning of the *143 trial for not more than 30 days to permit such a hearing to take place.
“(e) A woman upon whom a partial-birth abortion is performed may not be prosecuted under this section, for a conspiracy to violate this section, or for an offense under section 2, 3, or 4 of this title based on a violation of this section.” 18 U. S. C. § 1531 (2000 ed., Supp. IV).
The Act also includes a provision authorizing civil actions that is not of relevance here. § 1531(c).
C
The District Court in Carhart concluded the Act was unconstitutional for two reasons. First, it determined the Act was unconstitutional because it lacked an exception allowing the procedure where necessary for the health of the mother. 331 F. Supp. 2d, at 1004-1030. Second, the District Court found the Act deficient because it covered not merely intact D&E but also certain other D&Es. Id., at 1030-1037.
The Court of Appeals for the Eighth Circuit addressed only the lack of a health exception. 413 F. 3d, at 803-804. The court began its analysis with what it saw as the appropriate question — “whether ‘substantial medical authority’ supports the medical necessity of the banned procedure.” Id., at 796 (quoting Stenberg, supra, at 938). This was the proper framework, according to the Court of Appeals, because “when a lack of consensus exists in the medical community, the Constitution requires legislatures to err on the side of protecting women’s health by including a health exception.” 413 F. 3d, at 796. The court rejected the Attorney General’s attempt to demonstrate changed evidentiary circumstances since Stenberg and considered itself bound by Stenberg’s conclusion that a health exception was required. 413 F. 3d, at 803 (explaining “[t]he record in [the] case and the record in Stenberg [were] similar in all significant respects”). It invalidated the Act. Ibid.
*144 D
The District Court in Planned Parenthood concluded the Act was unconstitutional “because it (1) pose[d] an undue burden on a woman’s ability to choose a second trimester abortion; (2) [was] unconstitutionally vague; and (3) required] a health exception as set forth by . . . Stenberg.” 320 F. Supp. 2d, at 1034-1035.
The Court of Appeals for the Ninth Circuit agreed. Like the Court of Appeals for the Eighth Circuit, it concluded the absence of a health exception rendered the Act unconstitutional. The court interpreted Stenberg to require a health exception unless “there is consensus in the medical community that the banned procedure is never medically necessary to preserve the health of women.” 435 F. 3d, at 1173. Even after applying a deferential standard of review to Congress’ factual findings, the Court of Appeals determined “substantial disagreement exists in the medical community regarding whether” the procedures prohibited by the Act are ever necessary to preserve a woman’s health. Id., at 1175-1176.
The Court of Appeals concluded further that the Act placed an undue burden on a woman’s ability to obtain a second-trimester abortion. The court found the textual differences between the Act and the Nebraska statute struck down in Stenberg insufficient to distinguish D&E and intact D&E. 435 F. 3d, at 1178-1180. As a result, according to the Court of Appeals, the Act imposed an undue burden because it prohibited D&E. Id., at 1180-1181.
Finally, the Court of Appeals found the Act void for vagueness. Id., at 1181. Abortion doctors testified they were uncertain which procedures the Act made criminal. The court thus concluded the Act did not offer physicians clear warning of its regulatory reach. Id., at 1181-1184. Resting on its understanding of the remedial framework established by this Court in Ayotte v. Planned Parenthood of Northern New Eng., 546 U. S. 320, 328-330 (2006), the Court of Appeals held *145 the Act was unconstitutional on its face and should be permanently enjoined. 435 F. 3d, at 1184-1191.
II
The principles set forth in the joint opinion in Planned Parenthood of Southeastern Pa. v. Casey, 505 U. S. 833 (1992), did not find support from all those who join the instant opinion. See id., at 979-1002 (Scalia, J., joined by Thomas, J., inter alios, concurring in judgment in part and dissenting in part). Whatever one’s views concerning the Casey joint opinion, it is evident a premise central to its conclusion — that the government has a legitimate and substantial interest in preserving and promoting fetal life — would be repudiated were the Court now to affirm the judgments of the Courts of Appeals.
Casey involved a challenge to Roe v. Wade, 410 U. S. 113 (1973). The opinion contains this summary:
“It must be stated at the outset and with clarity that Roe’s essential holding, the holding we reaffirm, has three parts. First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State’s interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman’s effective right to elect the procedure. Second is a confirmation of the State’s power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman’s life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child. These principles do not contradict one another; and we adhere to each.” 505 U. S., at 846 (opinion of the Court).
*146 Though all three holdings are implicated in the instant cases, it is the third that requires the most extended discussion; for we must determine whether the Act furthers the legitimate interest of the Government in protecting the life of the fetus that may become a child.
To implement its holding, Casey rejected both Roe’s rigid trimester framework and the interpretation of Roe that considered all previability regulations of abortion unwarranted. 505 U. S., at 875-876, 878 (plurality opinion). On this point Casey overruled the holdings in two cases because they undervalued the State’s interest in potential life. See id., at 881-883 (joint opinion) (overruling Thornburgh v. American College of Obstetricians and Gynecologists, 476 U. S. 747 (1986), and Akron v. Akron Center for Reproductive Health, Inc., 462 U. S. 416 (1983)).
We assume the following principles for the purposes of this opinion. Before viability, a State “may not prohibit any woman from making the ultimate decision to terminate her pregnancy.” 505 U. S., at 879 (plurality opinion). It also may not impose upon this right an undue burden, which exists if a regulation’s “purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.” Id., at 878. On the other hand, “[regulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman’s exercise of the right to choose.” Id., at 877. Casey, in short, struck a balance. The balance was central to its holding. We now apply its standard to the cases at bar.
Ill
We begin with a determination of the Act’s operation and effect. A straightforward reading of the Act’s text demonstrates its purpose and the scope of its provisions: It regu *147 lates and proscribes, with exceptions or qualifications to be discussed, performing the intact D&E procedure.
Respondents agree the Act encompasses intact D&E, but they contend its additional reach is both unclear and excessive. . Respondents assert that, at the least, the Act is void for vagueness because its scope is indefinite. In the alternative, respondents argue the Act’s text proscribes all D&Es. Because D&E is the most common second-trimester abortion method, respondents suggest the Act imposes an undue burden. In this litigation the Attorney General does not dispute that the Act would impose an undue burden if it covered standard D&E.
We conclude that the Act is not void for vagueness, does not impose an undue burden from any overbreadth, and is not invalid on its face.
A
The Act punishes “knowingly performing] ” a “partial-birth abortion.” § 1531(a) (2000 ed., Supp. IV). It defines the unlawful abortion in explicit terms. § 1531(b)(1).
First, the person performing the abortion must “vaginally delivejr] a living fetus.” § 1531(b)(1)(A). The Act does not restrict an abortion procedure involving the delivery of an expired fetus. The Act, furthermore, is inapplicable to abortions that do not involve vaginal delivery (for instance, hysterotomy or hysterectomy). The Act does apply both previability and postviability because, by common understanding and scientific terminology, a fetus is a living organism while within the womb, whether or not it is viable outside the womb. See, e. g., Planned Parenthood, 320 F. Supp. 2d, at 971-972. We do not understand this point to be contested by the parties.
Second, the Act’s definition of partial-birth abortion requires the fetus to be delivered “until, in the case of a headfirst presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part *148 of the fetal trunk past the navel is outside the body of the mother.” § 1531(b)(1)(A). The Attorney General concedes, and we agree, that if an abortion procedure does not involve the delivery of a living fetus to one of these “anatomical ‘landmarks’” — where, depending on the presentation, either the fetal head or the fetal trunk past the navel is outside the body of the mother — the prohibitions of the Act do not apply. Brief for Petitioner in No. 05-380, p. 46.
Third, to fall within the Act, a doctor must perform an “overt act, other than completion of delivery, that kills the partially delivered living fetus.” § 1531(b)(1)(B). For purposes of criminal liability, the overt act causing the fetus’ death must be separate from delivery. And the overt act must occur after the delivery to an anatomical landmark. This is because the Act proscribes killing “the partially delivered” fetus, which, when read in context, refers to a fetus that has been delivered to an anatomical landmark. Ibid.
Fourth, the Act contains scienter requirements concerning all the actions involved in the prohibited abortion. To begin with, the physician must have “deliberately and intentionally” delivered the fetus to one of the Act’s anatomical landmarks. § 1531(b)(1)(A). If a living fetus is delivered past the critical point by accident or inadvertence, the Act is inapplicable. In addition, the fetus must have been delivered “for the purpose of performing an overt act that the [doctor] knows will kill [it].” Ibid. If either intent is absent, no crime has occurred. This follows from the general principle that where scienter is required no crime is committed absent the requisite state of mind. See generally 1 W. LaFave, Substantive Criminal Law § 5.1 (2d ed. 2003) (hereinafter La-Fave); 1 C. Torcía, Wharton’s Criminal Law §27 (15th ed. 1993).
B
Respondents contend the language described above is indeterminate, and they thus argue the Act is unconstitutionally vague on its face. “As generally stated, the void-for- *149 vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.” Kolender v. Lawson, 461 U. S. 352, 357 (1983); Posters ‘N’ Things, Ltd. v. United States, 511 U. S. 513, 525 (1994). The Act satisfies both requirements.
The Act provides doctors “of ordinary intelligence a reasonable opportunity to know what is prohibited.” Grayned v. City of Rockford, 408 U. S. 104,108 (1972). Indeed, it sets forth “relatively clear guidelines as to prohibited conduct” and provides “objective criteria” to evaluate whether a doctor has performed a prohibited procedure. Posters ‘N’ Things, supra, at 525-526. Unlike the statutory language in Stenberg that prohibited the delivery of a “‘substantial portion’ ” of the fetus — where a doctor might question how much of the fetus is a substantial portion — the Act defines the line between potentially criminal conduct on the one hand and lawful abortion on the other. Stenberg, 530 U. S., at 922 (quoting Neb. Rev. Stat. Ann. §28-326(9) (Supp. 1999)). Doctors performing D&E will know that if they do not deliver a living fetus to an anatomical landmark they will not face criminal liability.
This conclusion is buttressed by the intent that must be proved to impose liability. The Court has made clear that scienter requirements alleviate vagueness concerns. Posters ‘N’ Things, supra, at 526; see also Colautti v. Franklin, 439 U. S. 379, 395 (1979) (“This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea”). The Act requires the doctor deliberately to have delivered the fetus to an anatomical landmark. 18 U.S.C. § 1531(b)(1)(A) (2000 ed., Supp. IV). Because a doctor performing a D&E will not face criminal liability if he or she delivers a fetus beyond the prohibited point by mistake, the Act cannot be described as “a trap for *150 those who act in good faith.” Colautti, supra, at 395 (internal quotation marks omitted).
Respondents likewise have failed to show that the Act should be invalidated on its face because it encourages arbitrary or discriminatory enforcement. Kolender, supra, at 357. Just as the Act’s anatomical landmarks provide doctors with objective standards, they also “establish minimal guidelines to govern law enforcement.” Smith v. Goguen, 415 U. S. 566, 574 (1974). The scienter requirements narrow the scope of the Act’s prohibition and limit prosecutorial discretion. It cannot be said that the Act “vests virtually complete discretion in the hands of [law enforcement] to determine whether the [doctor] has satisfied [its provisions].” Kolender, supra, at 358 (invalidating a statute regulating loitering). Respondents’ arguments concerning arbitrary enforcement, furthermore, are somewhat speculative. This is a preenforcement challenge, where “no evidence has been, or could be, introduced to indicate whether the [Act] has been enforced in a discriminatory manner or with the aim of inhibiting [constitutionally protected conduct].” Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U. S. 489, 503 (1982). The Act is not vague.
C
We next determine whether the Act imposes an undue burden, as a facial matter, because its restrictions on second-trimester abortions are too broad. A review of the statutory text discloses the limits of its reach. The Act prohibits intact D&E; and, notwithstanding respondents’ arguments, it does not prohibit the D&E procedure in which the fetus is removed in parts.
1
The Act prohibits a doctor from intentionally performing an intact D&E. The dual prohibitions of the Act, both of which are necessary for criminal liability, correspond with the steps generally undertaken during this type of proce *151 dure. First, a doctor delivers the fetus until its head lodges in the cervix, which is usually past the anatomical landmark for a breech presentation. See 18 U. S. C. § 1531(b)(1)(A) (2000 ed., Supp. IV). Second, the doctor proceeds to pierce the fetal skull with scissors or crush it with forceps. This step satisfies the overt-act requirement because it kills the fetus and is distinct from delivery. See § 1531(b)(1)(B). The Act’s intent requirements, however, limit its reach to those physicians who carry out the intact D&E after intending to undertake both steps at the outset.
The Act excludes most D&Es in which the fetus is removed in pieces, not intact. If the doctor intends to remove the fetus in parts from the outset, the doctor will not have the requisite intent to incur criminal liability. A doctor performing a standard D&E procedure can often “tak[e] about 10-15 ‘passes’ through the uterus to remove the entire fetus.” Planned Parenthood, 320 F. Supp. 2d, at 962. Removing the fetus in this manner does not violate the Act because the doctor will not have delivered the living fetus to one of the anatomical landmarks or committed an additional overt act that kills the fetus after partial delivery. § 1531(b)(1).
A comparison of the Act with the Nebraska statute struck down in Stenberg confirms this point. The statute in Stenberg prohibited “‘deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof, for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child and does kill the unborn child.’” 530 U. S., at 922 (quoting Neb. Rev. Stat. Ann. § 28-326(9) (Supp. 1999)). The Court concluded that this statute encompassed D&E because “D&E will often involve a physician pulling a ‘substantial portion’ of a still living fetus, say, an arm or leg, into the vagina prior to the death of the fetus.” 530 U. S., at 939. The Court also rejected the limiting interpretation urged by Nebraska’s Attorney General that the statute’s reference to *152 a “procedure” that “ ‘kill[s] the unborn child’ ” was to a distinct procedure, not to the abortion procedure as a whole. Id., at 948.
Congress, it is apparent, responded to these concerns because the Act departs in material ways from the statute in Stenberg. It adopts the phrase “delivers a living fetus,” § 1531(b)(1)(A), instead of “ ‘delivering ... a living unborn child, or a substantial portion thereof,’ ” 530 U. S., at 938 (quoting Neb. Rev. Stat. Ann. § 28-326(9) (Supp. 1999)). The Act’s language, unlike the statute in Stenberg, expresses the usual meaning of “deliver” when used in connection with “fetus,” namely, extraction of an entire fetus rather than removal of fetal pieces. See Stedman’s Medical Dictionary 470 (27th ed. 2000) (defining deliver as “[t]o assist a woman in childbirth” and “[t]o extract from an enclosed place, as the fetus from the womb, an object or foreign body”); see also I. Dox, B. Melloni, G. Eisner, & J. Melloni, The HarperCollins Illustrated Medical Dictionary 160 (4th ed. 2001); Merriam-Webster’s Collegiate Dictionary 306 (10th ed. 1997). The Act thus displaces the interpretation of “delivering” dictated by the Nebraska statute’s reference to a “substantial portion” of the fetus. Stenberg, supra, at 944 (indicating that the Nebraska “statute itself specifies that it applies both to delivering ‘an intact unborn child’ or ‘a substantial portion thereof’”). In interpreting statutory texts courts use the ordinary meaning of terms unless context requires a different result. See, e. g., 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47:28 (rev. 6th ed. 2000). Here, unlike in Stenberg, the language does not require a departure from the ordinary meaning. D&E does not involve the delivery of a fetus because it requires the removal of fetal parts that are ripped from the fetus as they are pulled through the cervix.
The identification of specific anatomical landmarks to which the fetus must be partially delivered also differentiates the Act from the statute at issue in Stenberg. *153 § 1531(b)(1)(A). The Court in Stenberg interpreted “‘substantial portion’ ” of the fetus to include an arm or a leg. 530 U. S., at 939. The Act’s anatomical landmarks, by contrast, clarify that the removal of a small portion of the fetus is not prohibited. The landmarks also require the fetus to be delivered so that it is partially “outside the body of the mother.” § 1531(b)(1)(A). To come within the ambit of the Nebraska statute, on the other hand, a substantial portion of the fetus only had to be delivered into the vagina; no part of the fetus had to be outside the body of the mother before a doctor could face criminal sanctions. Id., at 938-939.
By adding an overt-act requirement Congress sought further to meet the Court’s objections to the state statute considered in Stenberg. Compare 18 U. S. C. § 1531(b)(1) (2000 ed., Supp. IV) with Neb. Rev. Stat. Ann. §28-326(9) (Supp. 1999). The Act makes the distinction the Nebraska statute failed to draw (but the Nebraska Attorney General advanced) by differentiating between the overall partial-birth abortion and the distinct overt act that kills the fetus. See Stenberg, supra, at 943-944. The fatal overt act must occur after delivery to an anatomical landmark, and it must be something “other than [the] completion of delivery.” § 1531(b)(1)(B). This distinction matters because, unlike intact D&E, standard D&E does not involve a delivery followed by a fatal act.
The canon of constitutional avoidance, finally, extinguishes any lingering doubt as to whether the Act covers the prototypical D&E procedure. “‘[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.’ ” Edward J. De-Bartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council, 485 U. S. 568, 575 (1988) (quoting Hooper v. California, 155 U. S. 648, 657 (1895)). It is true this longstanding maxim of statutory interpretation has, in the past, fallen by the wayside when the Court confronted a statute regulating abortion. The Court at times employed an an *154 tagonistic “ ‘canon of construction under which in cases involving abortion, a permissible reading of a statute [was] to be avoided at all costs.’” Stenberg, supra, at 977 (Kennedy, J., dissenting) (quoting Thornburgh, 476 U. S., at 829 (O’Connor, J., dissenting); some internal quotation marks omitted). Casey put this novel statutory approach to rest. Stenberg, supra, at 977 (Kennedy, J., dissenting). Stenberg need not be interpreted to have revived it. We read that decision instead to stand for the uncontroversial proposition that the canon of constitutional avoidance does not apply if a statute is not “genuinely susceptible to two constructions.” Almendarez-Torres v. United States, 523 U. S. 224, 238 (1998); see also Clark v. Martinez, 543 U. S. 371, 385 (2005). In Stenberg the Court found the statute covered D&E. 530 U. S., at 938-945. Here, by contrast, interpreting the Act so that it does not prohibit standard D&E is the most reasonable reading and understanding of its terms.
2
Contrary arguments by respondents are unavailing. Respondents look to situations that might arise during D&E, situations not examined in Stenberg. They contend — relying on the testimony of numerous abortion doctors — that D&E may result in the delivery of a living fetus beyond the Act’s anatomical landmarks in a significant fraction of cases. This is so, respondents say, because doctors cannot predict the amount the cervix will dilate before the abortion procedure. It might dilate to a degree that the fetus will be removed largely intact. To complete the abortion, doctors will commit an overt act that kills the partially delivered fetus. Respondents thus posit that any D&E has the potential to violate the Act, and that a physician will not know beforehand whether the abortion will proceed in a prohibited manner. Brief for Respondent Planned Parenthood et al. in No. 05-1382, p. 38.
*155 This reasoning, however, does not take account of the Act’s intent requirements, which preclude liability from attaching to an accidental intact D&E. If a doctor’s intent at the outset is to perform a D&E in which the fetus would not be delivered to either of the Act’s anatomical landmarks, but the fetus nonetheless is delivered past one of those points, the requisite and prohibited scienter is not present. 18 U. S. C. § 1531(b)(1)(A) (2000 ed., Supp. IV). When a doctor in that situation completes an abortion by performing an intact D&E, the doctor does not violate the Act. It is true that intent to cause a result may sometimes be inferred if a person “knows that that result is practically certain to follow from his conduct.” 1 LaFave § 5.2(a), at 341. Yet abortion doctors intending at the outset to perform a standard D&E procedure will not know that a prohibited abortion “is practically certain to follow from” their conduct. Ibid. A fetus is only delivered largely intact in a small fraction of the overall number of D&E abortions. Planned Parenthood, 320 F. Supp. 2d, at 965.
The evidence also supports a legislative determination that an intact delivery is almost always a conscious choice rather than a happenstance. Doctors, for example, may remove the fetus in a manner that will increase the chances of an intact delivery. See, e. g., App. in No. 05-1382, at 74, 452. And intact D&E is usually described as involving some manner of serial dilation. See, e. g., Dilation and Extraction 110. Doctors who do not seek to obtain this serial dilation perform an intact D&E on far fewer occasions. See, e. g., Carhart, 331 F. Supp. 2d, at 857-858 (“In order for intact removal to occur on a regular basis, Dr. Fitzhugh would have to dilate his patients with a second round of laminaria”). This evidence belies any claim that a standard D&E cannot be performed without intending or foreseeing an intact D&E.
Many doctors who testified on behalf of respondents, and who objected to the Act, do not perform an intact D&E by accident. On the contrary, they begin every D&E abortion *156 with the objective of removing the fetus as intact as possible. See, e.g., id., at 869 (“Since Dr. Chasen believes that the intact D & E is safer than the dismemberment D & E, Dr. Chasen’s goal is to perform an intact D&E every time”); see also id., at 873,886. This does not prove, as respondents suggest, that every D&E might violate the Act and that the Act therefore imposes an undue burden. It demonstrates only that those doctors who intend to perform a D&E that would involve delivery of a living fetus to one of the Act’s anatomical landmarks must adjust their conduct to the law by not attempting to deliver the fetus to either of those points. Respondents have not shown that requiring doctors to intend dismemberment before delivery to an anatomical landmark will prohibit the vast majority of D&E abortions. The Act, then, cannot be held invalid on its face on these grounds.
IV
Under the principles accepted as controlling here, the Act, as we have interpreted it, would be unconstitutional “if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.” Casey, 505 U. S., at 878 (plurality opinion). The abortions affected by the Act’s regulations take place both previability and postviability; so the quoted language and the undue burden analysis it relies upon are applicable. The question is whether the Act, measured by its text in this facial attack, imposes a substantial obstacle to late-term, but previability, abortions. The Act does not on its face impose a substantial obstacle, and we reject this further facial challenge to its validity.
A
The Act’s purposes are set forth in recitals preceding its operative provisions. A description of the prohibited abortion procedure demonstrates the rationale for the congressional enactment. The Act proscribes a method of abortion *157 in which a fetus is killed just inches before completion of the birth process. Congress stated as follows: “Implicitly approving such a brutal and inhumane procedure by choosing not to prohibit it will further coarsen society to the humanity of not only newborns, but all vulnerable and innocent human life, making it increasingly difficult to protect such life.” Congressional Findings ¶ (14)(N). The Act expresses respect for the dignity of human life.
Congress was concerned, furthermore, with the effects on the medical community and on its reputation caused by the practice of partial-birth abortion. The findings in the Act explain:
“Partial-birth abortion . . . confuses the medical, legal, and ethical duties of physicians to preserve and promote life, as the physician acts directly against the physical life of a child, whom he or she had just delivered, all but the head, out of the womb, in order to end that life.” Id., ¶ (14)(J).
There can be no doubt the government “has an interest in protecting the integrity and ethics of the medical profession.” Washington v. Glucksberg, 521 U. S. 702, 731 (1997); see also Barsky v. Board of Regents of Univ. of N. Y, 347 U. S. 442, 451 (1954) (indicating the State has “legitimate concern for maintaining high standards of professional conduct” in the practice of medicine). Under our precedents it is clear the State has a significant role to play in regulating the medical profession.
Casey reaffirmed these governmental objectives. The government may use its voice and its regulatory authority to show its profound respect for the life within the woman. A central premise of the opinion was that the Court’s precedents after Roe had “undervalue^] the State’s interest in potential life.” 505 U. S., at 873 (plurality opinion); see also id., at 871. The plurality opinion indicated “[t]he fact that a law which serves a valid purpose, one not designed to strike *158 at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it.” Id., at 874. This was not an idle assertion. The three premises of Casey must coexist. See id., at 846 (opinion of the Court). The third premise, that the State, from the inception of the pregnancy, maintains its own regulatory interest in protecting the life of the fetus that may become a child, cannot be set at naught by interpreting Casey’s requirement of a health exception so it becomes tantamount to allowing a doctor to choose the abortion method he or she might prefer. Where it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn.
The Act’s ban on abortions that involve partial delivery of a living fetus furthers the Government’s objectives. No one would dispute that, for many, D&E is a procedure itself laden with the power to devalue human life. Congress could nonetheless conclude that the type of abortion proscribed by the Act requires specific regulation because it implicates additional ethical and moral concerns that justify a special prohibition. Congress determined that the abortion methods it proscribed had a “disturbing similarity to the killing of a newborn infant,” Congressional Findings ¶ (14)(L), and thus it was concerned with “draw[ing] a bright line that clearly distinguishes abortion and infanticide,” id., ¶ (14)(G). The Court has in the past confirmed the validity of drawing boundaries to prevent certain practices that extinguish life and are close to actions that are condemned. Glucksberg found reasonable the State’s “fear that permitting assisted suicide will start it down the path to voluntary and perhaps even involuntary euthanasia.” 521 U. S., at 732-735, and n. 23.
*159 Respect for human life finds an ultimate expression in the bond of love the mother has for her child. The Act recognizes this reality as well. Whether to have an abortion requires a difficult and painful moral decision. Casey, supra, at 852-853 (opinion of the Court). While we find no reliable data to measure the phenomenon, it seems unexceptionable to conclude some women come to regret their choice to abort the infant life they once created and sustained. See Brief for Sandra Cano et al. as Amici Curiae in No. 05-380, pp. 22-24. Severe depression and loss of esteem can follow. See ibid.
In a decision so fraught with emotional consequence some doctors may prefer not to disclose precise details of the means that will be used, confining themselves to the required statement of risks the procedure entails. From one standpoint this ought not to be surprising. Any number of patients facing imminent surgical procedures would prefer not to hear all details, lest the usual anxiety preceding invasive medical procedures become the more intense. This is likely the case with the abortion procedures here in issue. See, e. g., National Abortion Federation, 330 F. Supp. 2d, at 466, n. 22 (“Most of [the plaintiffs’] experts acknowledged that they do not describe to their patients what [the D&E and intact D&E] procedures entail in clear and precise terms”); see also id., at 479.
It is, however, precisely this lack of information concerning the way in which the fetus will be killed that is of legitimate concern to the State. Casey, supra, at 873 (plurality opinion) (“States are free to enact laws to provide a reasonable framework for a woman to make a decision that has such profound and lasting meaning”). The State has an interest in ensuring so grave a choice is well informed. It is self-evident that a mother who comes to regret her choice to abort must struggle with grief more anguished and sorrow more profound when she learns, only after the event, what *160 she once did not know: that she allowed a doctor to pierce the skull and vacuum the fast-developing brain of her unborn child, a child assuming the human form.
It is a reasonable inference that a necessary effect of the regulation and the knowledge it conveys will be to encourage some women to carry the infant to full term, thus reducing the absolute number of late-term abortions. The medical profession, furthermore, may find different and less shocking methods to abort the fetus in the second trimester, thereby accommodating legislative demand. The State’s interest in respect for life is advanced by the dialogue that better informs the political and legal systems, the medical profession, expectant mothers, and society as a whole of the consequences that follow from a decision to elect a late-term abortion.
It is objected that the standard D&E is in some respects as brutal, if not more, than the intact D&E, so that the legislation accomplishes little. What we have already said, however, shows ample justification for the regulation. Partial-birth abortion, as defined by the Act, differs from a standard D&E because the former occurs when the fetus is partially outside the mother to the point of one of the Act’s anatomical landmarks. It was reasonable for Congress to think that partial-birth abortion, more than standard D&E, “undermines the public’s perception of the appropriate role of a physician during the delivery process, and perverts a process during which life is brought into the world.” Congressional Findings ¶ (14)(K). There would be a flaw in this Court’s logic, and an irony in its jurisprudence, were we first to conclude a ban on both D&E and intact D&E was overbroad and then to say it is irrational to ban only intact D&E because that does not proscribe both procedures. In sum, we reject the contention that the congressional purpose of the Act was “to place a substantial obstacle in the path of a woman seeking an abortion.” 505 U. S., at 878 (plurality opinion).
*161 B
The Act’s furtherance of legitimate government interests bears upon, but does not resolve, the next question: whether the Act has the effect of imposing an unconstitutional burden on the abortion right because it does not allow use of the barred procedure where “ ‘necessary, in appropriate medical judgment, for the preservation of the . . . health of the mother.’” Ayotte, 546 U. S., at 327-328 (quoting Casey, supra, at 879 (plurality opinion)). The prohibition in the Act would be unconstitutional, under precedents we here assume to be controlling, if it “subject[ed] [women] to significant health risks.” Ayotte, supra, at 328; see also Casey, supra, at 880 (opinion of the Court). In Ayotte the parties agreed a health exception to the challenged parental-involvement statute was necessary ‘‘to avert serious and often irreversible damage to [a pregnant minor’s] health.” 546 U. S., at 328. Here, by contrast, whether the Act creates significant health risks for women has been a contested factual question. The evidence presented in the trial courts and before Congress demonstrates both sides have medical support for their position.
Respondents presented evidence that intact D&E may be the safest method of abortion, for reasons similar to those adduced in Stenberg. See 530 U. S., at 932. Abortion doctors testified, for example, that intact D&E decreases the risk of cervical laceration or uterine perforation because it requires fewer passes into the uterus with surgical instruments and does not require the removal of bony fragments of the dismembered fetus, fragments that may be sharp. Respondents also presented evidence that intact D&E was safer both because it reduces the risks that fetal parts will remain in the uterus and because it takes less time to complete. Respondents, in addition, proffered evidence that intact D&E was safer for women with certain medical conditions or women with fetuses that had certain anomalies. See, e. g., Carhart, 331 F. Supp. 2d, at 923-929; National *162 Abortion Federation, 330 F. Supp. 2d, at 470-474; Planned Parenthood, 320 F. Supp. 2d, at 982-983.
These contentions were contradicted by other doctors who testified in the District Courts and before Congress. They concluded that the alleged health advantages were based on speculation without scientific studies to support them. They considered D&E always to be a safe alternative. See, e. g., Carhart, supra, at 930-940; National Abortion Federation, supra, at 470-474; Planned Parenthood, 320 F. Supp. 2d, at 983.
There is documented medical disagreement whether the Act’s prohibition would ever impose significant health risks on women. See, e. g., id., at 1033 (“[T]here continues to be a division of opinion among highly qualified experts regarding the necessity or safety of intact D & E”); see also National Abortion Federation, supra, at 482. The three District Courts that considered the Act’s constitutionality appeared to be in some disagreement on this central factual question. The District Court for the District of Nebraska concluded “the banned procedure is, sometimes, the safest abortion procedure to preserve the health of women.” Carhart, supra, at 1017. The District Court for the Northern District of California reached a similar conclusion. Planned Parenthood, supra, at 1002 (finding intact D&E was “under certain circumstances... significantly safer than D & E by disarticulation”). The District Court for the Southern District of New York was more skeptical of the purported health benefits of intact D&E. It found the Attorney General’s “expert witnesses reasonably and effectively refuted [the plaintiffs’] proffered bases for the opinion that [intact D&E] has safety advantages over other second-trimester abortion procedures.” National Abortion Federation, 330 F. Supp. 2d, at 479. In addition it did “not believe that many of [the plaintiffs’] purported reasons for why [intact D&E] is medically necessary [were] credible; rather [it found them to be] theoretical or false.” Id., at 480. The court nonetheless in *163 validated the Act because it determined “a significant body of medical opinion . . . holds that D & E has safety advantages over induction and that [intact D&E] has some safety advantages (however hypothetical and unsubstantiated by scientific evidence) over D & E for some women in some circumstances.” Ibid.
The question becomes whether the Act can stand when this medical uncertainty persists. The Court’s precedents instruct that the Act can survive this facial attack. The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty. See Kansas v. Hendricks, 521 U. S. 346, 360, n. 3 (1997); Jones v. United States, 463 U. S. 354, 364-365, n. 13, 370 (1983); Lambert v. Yellowley, 272 U. S. 581, 597 (1926); Collins v. Texas, 223 U.S. 288, 297-298 (1912); Jacobson v. Massachusetts, 197 U. S. 11, 30-31 (1905); see also Stenberg, supra, at 969-972 (Kennedy, J., dissenting); Marshall v. United States, 414 U. S. 417, 427 (1974) (“When Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad”).
This traditional rule is consistent with Casey, which confirms the State’s interest in promoting respect for human life at all stages in the pregnancy. Physicians are not entitled to ignore regulations that direct them to use reasonable alternative procedures. The law need not give abortion doctors unfettered choice in the course of their medical practice, nor should it elevate their status above other physicians in the medical community. In Casey the controlling opinion held an informed-consent requirement in the abortion context was “no different from a requirement that a doctor give certain specific information about any medical procedure.” 505 U. S., at 884 (joint opinion). The opinion stated “the doctor-patient relation here is entitled to the same solicitude it receives in other contexts.” Ibid.; see also Webster v. Reproductive Health Services, 492 U. S. 490, 518-519 (1989) *164 (plurality opinion) (criticizing Roe’s trimester framework because, inter alia, it “left this Court to serve as the country’s ex officio medical board with powers to approve or disapprove medical and operative practices and standards throughout the United States” (internal quotation marks omitted)); Mazurek v. Armstrong, 520 U. S. 968, 973 (1997) (per curiam) (upholding a restriction on the performance of abortions to licensed physicians despite the respondents’ contention “all health evidence contradicts the claim that there is any health basis for the law” (internal quotation marks omitted)).
Medical uncertainty does not foreclose the exercise of legislative power in the abortion context any more than it does in other contexts. See Hendricks, supra, at 360, n. 3. The medical uncertainty over whether the Act’s prohibition creates significant health risks provides a sufficient basis to conclude in this facial attack that the Act does not impose an undue burden.
The conclusion that the Act does not impose an undue burden is supported by other considerations. Alternatives are available to the prohibited procedure. As we have noted, the Act does not proscribe D&E. One District Court found D&E to have extremely low rates of medical complications. Planned Parenthood, supra, at 1000. Another indicated D&E was “generally the safest method of abortion during the second trimester.” Carhart, 331 F. Supp. 2d, at 1031; see also National Abortion Federation, supra, at 467-468 (explaining that “[e]xperts testifying for both sides” agreed D&E was safe). In addition the Act’s prohibition only applies to the delivery of “a living fetus.” 18 U. S. C. § 1531(b)(1)(A) (2000 ed., Supp. IV). If the intact D&E procedure is truly necessary in some circumstances, it appears likely an injection that kills the fetus is an alternative under the Act that allows the doctor to perform the procedure.
The instant cases, then, are different from Planned Parenthood of Central Mo. v. Danforth, 428 U. S. 52, 77-79 *165 (1976), in which the Court invalidated a ban on saline amniocentesis, the then-dominant second-trimester abortion method. The Court found the ban in Danforth to be “an unreasonable or arbitrary regulation designed to inhibit, and having the effect of inhibiting, the vast majority of abortions after the first 12 weeks.” Id., at 79. Here the Act allows, among other means, a commonly used and generally accepted method, so it does not construct a substantial obstacle to the abortion right.
In reaching the conclusion the Act does not require a health exception we reject certain arguments made by the parties on both sides of these cases. On the one hand, the Attorney General urges us to uphold the Act on the basis of the congressional findings alone. Brief for Petitioner in No. 05-380, at 23. Although we review congressional fact-finding under a deferential standard, we do not in the circumstances here place dispositive weight on Congress’ findings. The Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake. See Crowell v. Benson, 285 U. S. 22, 60 (1932) (“In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function”).
As respondents have noted, and the District Courts recognized, some recitations in the Act are factually incorrect. See National Abortion Federation, 330 F. Supp. 2d, at 482, 488-491. Whether or not accurate at the time, some of the important findings have been superseded. Two examples suffice. Congress determined no medical schools provide instruction on the prohibited procedure. Congressional Findings ¶ (14)(B). The testimony in the District Courts, however, demonstrated intact D&E is taught at medical schools. National Abortion Federation, supra, at 490; Planned Parenthood, 320 F. Supp. 2d, at 1029. Congress also found there existed a medical consensus that the prohibited procedure *166 is never medically necessary. Congressional Findings ¶ (1). The evidence presented in the District Courts contradicts that conclusion. See, e.g., Carhart, supra, at 1012-1015; National Abortion Federation, supra, at 488-489; Planned Parenthood, supra, at 1025-1026. Uncritical deference to Congress’ factual findings in these cases is inappropriate.
On the other hand, relying on the Court’s opinion in Stenberg, respondents contend that an abortion regulation must contain a health exception “if ‘substantial medical authority supports the proposition that banning a particular procedure could endanger women’s health.’ ” Brief for Respondents in No. 05-380, p. 19 (quoting 530 U. S., at 938); see also Brief for Respondent Planned Parenthood et al. in No. 05-1382, at 12 (same). As illustrated by respondents’ arguments and the decisions of the Courts of Appeals, Stenberg has been interpreted to leave no margin of error for legislatures to act in the face of medical uncertainty. Carhart, 413 F. 3d, at 796; Planned Parenthood, 435 F. 3d, at 1173; see also National Abortion Federation, 437 F. 3d, at 296 (Walker, C. J., concurring) (explaining the standard under Stenberg “is a virtually insurmountable evidentiary hurdle”).
A zero tolerance policy would strike down legitimate abortion regulations, like the present one, if some part of the medical community were disinclined to follow the proscription. This is too exacting a standard to impose on the legislative power, exercised in this instance under the Commerce Clause, to regulate the medical profession. Considerations of marginal safety, including the balance of risks, are within the legislative competence when the regulation is rational and in pursuit of legitimate ends. When standard medical options are available, mere convenience does not suffice to displace them; and if some procedures have different risks than others, it does not follow that the State is altogether barred from imposing reasonable regulations. The Act is not invalid on its face where there is uncertainty over whether the barred procedure is ever necessary to preserve *167 a woman’s health, given the availability of other abortion procedures that are considered to be safe alternatives.
V
The considerations we have discussed support our further determination that these facial attacks should not have been entertained in the first instance. In these circumstances the proper means to consider exceptions is by as-applied challenge. The Government has acknowledged that preenforcement, as-applied challenges to the Act can be maintained. Tr. of Oral Arg. in No. 05-380, pp. 21-23. This is the proper manner to protect the health of the woman if it can be shown that in discrete and well-defined instances a particular condition has or is likely to occur in which the procedure prohibited by the Act must be used. In an as-applied challenge the nature of the medical risk can be better quantified and balanced than in a facial attack.
The latitude given facial challenges in the First Amendment context is inapplicable here. Broad challenges of this type impose “a heavy burden” upon the parties maintaining the suit. Rust v. Sullivan, 500 U. S. 173, 183 (1991). What that burden consists of in the specific context of abortion statutes has been a subject of some question. Compare Ohio v. Akron Center for Reproductive Health, 497 U. S. 502, 514 (1990) (“[B]ecause appellees are making a facial challenge to a statute, they must show that no set of circumstances exists under which the Act would be valid” (internal quotation marks omitted)), with Casey, 505 U. S., at 895 (opinion of the Court) (indicating a spousal-notification statute would impose an undue burden “in a large fraction of the eases in which [it] is relevant” and holding the statutory provision facially invalid). See also Janklow v. Planned Parenthood, Sioux Falls Clinic, 517 U. S. 1174 (1996). We need not resolve that debate.
As the previous sections of this opinion explain, respondents have not demonstrated that the Act would be unconsti *168 tutional in a large fraction of relevant cases. Casey, supra, at 895 (opinion of the Court). We note that the statute here applies to all instances in which the doctor proposes to use the prohibited procedure, not merely those in which the woman suffers from medical complications. It is neither our obligation nor within our traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop. “[I]t would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation.” United States v. Raines, 362 U. S. 17, 21 (1960) (internal quotation marks omitted). For this reason, “[a]s-applied challenges are the basic building blocks of constitutional adjudication.” Fallon, As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1328 (2000).
The Act is open to a proper as-applied challenge in a discrete case. Cf. Wisconsin Right to Life, Inc. v. Federal Election Comm’n, 546 U. S. 410, 412 (2006) (per curiam). No as-applied challenge need be brought if the prohibition in the Act threatens a woman’s life because the Act already contains a life exception. 18 U. S. C. § 1531(a) (2000 ed., Supp. IV).
H= * *
Respondents have not demonstrated that the Act, as a facial matter, is void for vagueness, or that it imposes an undue burden on a woman’s right to abortion based on its over-breadth or lack of a health exception. For these reasons the judgments of the Courts of Appeals for the Eighth and Ninth Circuits are reversed.

It is so ordered.