WILKINSON, Circuit Judge,
concurring:
I am happy to join Judge Niemeyer’s fine opinion in this case. As the opinion mentions, the Supreme Court remanded our previous decision for “further consideration” in light of Gonzales v. Carhart, 550 U.S. 124, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007). Herring v. Richmond Med. Ctr. for Women, 550 U.S. 901, 127 S.Ct. 2094, 167 L.Ed.2d 810 (2007). It is doubtful that, by “further consideration,” the Supreme Court meant avoiding the plain import of Gonzales v. Carhart and finding constitutional infirmities where none exist. To the contrary, proper reconsideration requires that we uphold Virginia’s statute because it is similar in its critical respects to the federal statute upheld by the Supreme Court.
Indeed, there is substantial eongruity between the two statutes. The Virginia statute applies to any person who “knowingly performs partial birth infanticide,” Va.Code Ann. § 18.2-71.1(A), and the federal statute applies to any person who “knowingly performs a partial-birth abortion,” 18 U.S.C. § 1531(a). Both statutes prohibit the same conduct: the delivery of a living fetus to the same anatomical landmarks, followed by an overt act (other than completing the delivery) that intentionally kills the fetus. And neither statute applies to a physician who completes the common (yet in many ways still disturbing) standard D & E procedure.
There is, to be sure, the one difference between the two statutes. If a physician intends at the outset to perform a standard D & E, and if the fetus is accidentally *181 delivered intact to an anatomical landmark, and if the mother’s life is not then at stake, then Virginia (but not federal) law forbids deliberately killing the fetus. Such a fíne distinction does not change a constitutional statute into an unconstitutional one. The state’s interest in protecting life recognized in Gonzales v. Carhart does not vanish when the intact delivery of the child is unintentional. Instead, it follows from Gonzales v. Carhart that the state may decide that proscribing a gruesome procedure to end the life of a child that has been partially delivered intact—either purposefully or accidentally—outweighs opposing interests, except of course where the mother’s life is in danger. The state may prohibit a deliberate and unconscionable act against the intact, partially born child, regardless of how the child got there.
Moreover, Gonzales v. Carhart makes clear that bringing a facial challenge in this case was inappropriate from the start. 550 U.S. at 167, 127 S.Ct. 1610. . Carhart pointedly cautions that we should not “resolve questions of constitutionality with respect to each potential situation that might develop.” Id. at 168, 127 S.Ct. 1610. Here, as in Carhart, we are asked to strike down a statute in its entirety based on nothing more than rare and speculative applications, none of which have been presented in this case with the concreteness necessary to support a facial or for that matter an as-applied attack. Indeed, the difference in application between the Virginia and federal statutes is hypothetical at best: the accidental emergence of the intact fetus to an anatomical landmark during a standard D & E is rare, to say the least. Virginia’s statute is constitutionally valid in almost all foreseeable circumstances, and we should not overstep our institutional bounds to invalidate it based on the off chance that an unconstitutional scenario might someday develop.
Putting issues of statutory interpretation aside, I believe that the majority also correctly touches on a more important concern: that matters of such medical complexity and moral tension as partial birth abortion should not be resolved by the courts, with no semblance of sanction from the Constitution they purport to interpret. Indeed, the sheer mass of medical detail summoned in this case has led us far beyond the ambit of our own professional competence. And it obscures the central question. This is a brutal business for which we are asked to provide constitutional protection, and nothing in law or precedent requires that we do so. To explain that belief requires consideration of three time periods: past, present, and future.

Past

It is inconceivable that the founding generation or the drafters of the Fourteenth Amendment thought that their Constitution dealt with the subject of partial birth abortion. The text of the Constitution does not touch on partial birth abortion, much less sanctify it. There was nothing in the debates leading to the Constitution’s or the Amendment’s ratification that even approached the matter or anything fairly analogous to it. And if historical practice is any guide, our forebears would have been amazed to discover that the Constitution had whisked the issue of partial birth abortion from the legislative branch and through some mysterious process assigned it to the courts.
Indeed, it is unthinkable the Framers meant to put their imprimatur on a singularly controversial method of abortion so unconnected to those struggles that led to the formation of this nation. Nor does protection for this method of abortion find a foothold in the ideals of equality and liberation from bondage that motivated the *182 conflict out of which the Fourteenth Amendment grew. It disrespects our forebears to make such inventions of their intentions and to invoke the greatness of their creation for ending the creation of a life halfway into this world.

Present

Controversy over abortion has raged in the decades since Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In truth, the matter of early-term abortions is a difficult and intractable one. On one hand, the choice of a female to abort a fetus is not only intimate but agonizing. No one wants to see a ban drive young women into unsafe circumstances. I understand the argument too that a momentary lapse in judgment should not be the occasion for severe burdens that may handicap a woman’s education and career throughout life. See Gonzales v. Carhart, 550 U.S. at 171-72, 127 S.Ct. 1610 (Ginsburg, J., dissenting). On the other hand, it is unsettling to tamper with the most sacred of life’s cycles and disquieting for those here on earth to pull the ladder up on those who would join the human company. But it is one thing to say that abortions present difficult questions as a matter of policy, and quite another to say that those questions should be resolved as a matter of constitutional law.
Indeed, the very difficulty of the issue commends itself to legislative compromise. It is in representative bodies where those who support and those who oppose abortion have the best chance for an airing of their honest beliefs. Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 1002, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (Scalia, J., concurring in the judgment in part and dissenting in part). Those who would strike Virginia’s statute as unconstitutional would take from them that chance and allow the people little voice on an issue where moral, religious, and philosophical beliefs have taken such deep root.
The majority and dissenting opinions in this case agree that the state may proscribe an intact D & E—in which an intact fetus is partially delivered and then killed—that is intended from the outset. They disagree, however, as to whether the state may also proscribe deliberately killing a fetus if a standard D & E—in which the fetus is meant to be extracted from the uterus in pieces—accidentally becomes an intact D & E and if the life of the mother is not then in danger. To invalidate Virginia’s statute on its face solely because it applies in this highly unusual circumstance is to say that courts have the ability not merely to create non-textual rights but to oversee their infinite permutations. To say further that the Virginia legislature cannot act to preserve humane ideals of protecting life not only traduces the views of past generations but denies present generations the opportunity to act upon the best and noblest of impulses.

Future

All civilizations will be measured in the fullness of time. Perhaps fine art, great invention, sustained prosperity, or enhanced longevity mark the quality of civilized life. Perhaps, I say, because there must be something more. How a society treats its most vulnerable members may do more than grandiosity to shape its lasting worth. A partially born child is among the weakest, most helpless beings in our midst and on that account exerts a special claim on our protection. So we can talk at length about facial challenges and as-applied challenges, and “standard D & E” procedures and “intact D & E” procedures, and “anatomical landmarks,” and “disarticulation,” and “fetal demise.” And we can deploy this terminology to disguise *183 what is happening, in the name of our founding document no less.
The future, however, will not be similarly misled. The fact is that we—civilized people—are retreating to the haven of our Constitution to justify dismembering a partly born child and crushing its skull. Surely centuries hence, people will look back on this gruesome practice done in the name of fundamental law by a society of high achievement. And they will shudder.
Others may see this issue differently, and they possess the means to enact their genuine convictions. As abhorrent as I find the procedure at issue, I would not deny the ability of democratic majorities to sanction it in law. It is the democratic process that enhances the mutual respect through law that both sides to this charged debate must work to achieve. But to jump from legislative enactment to constitutional edict is a leap too far. To say that our founding document and fundamental values affirmatively sanction this procedure— based on an argument over the precise timing of a doctor’s intent to extinguish the existence of an emerging infant—is to invite coming generations to judge harshly the coldness of our ways.
My fine colleague in dissent expresses his view that this concurrence represents some disagreement on my part with the Supreme Court’s abortion jurisprudence. Post at 197-98. I would remind him, however, that it is I who would follow the Supreme Court’s clear instructions regarding the inadvisability of facial challenges and the Supreme Court’s decision in Gonzales v. Carhart which upheld a federal statute closely akin to the one that my dissenting colleague would strike down.
The finale to my friend’s dissent misses the point. This case is not about abortion generally, but rather the particular practice of partial birth abortion to which the Virginia statute addresses itself. As to this practice, I have no hesitancy in expressing my personal opposition, but only to underscore the point that I would respect completely a democratic judgment that runs contrary to my view. The dissent notes the moral complexity of the abortion issue, a proposition with which I agree. The dissent embraces certain of Dr. Fitzhugh’s empirical assertions, the validity of which I am in no position to judge. But both the moral debate and the empirical assertions caution yet once more against the loss of all faith in our federal system, the foreclosure of prospects for legislative compromise, and the preemption of democratic liberty by the courts. And that is what in the last analysis this case is about: how the question of partial birth abortion is to be decided. It is wrong to recognize no discernible limits on the ability of courts to constitutionalize this heinous practice down to its last detail.
Such treatment of the truly helpless will not stand the test of time. Virginia’s statute invokes the consent of the governed to soften the sting of the impending rebuke. Our invocation of precepts found nowhere in the Constitution’s text or history will not provide us a comparable defense. Where the people’s will and moral claims on behalf of the powerless are aligned, plying the Constitution to defeat both is a wrong future generations will not overlook. They will understand this inversion of law’s legitimate role in protecting the weak, and they will ask: “What on earth were they thinking? What on earth were they thinking?”
I would reverse the judgment of the district court.