GRUENDER, Circuit Judge,
concurring in part and dissenting in part.
I concur in Parts II. A, B, and D of the opinion of the Court, holding that the “human being,” “relationship,” and general “risk” advisories, respectively, withstand Planned Parenthood’s facial constitutional challenges. However, I respectfully dissent from the Court’s holding in Part II. C that the “suicide” advisory is untruthful and misleading. While the Court states that the record “does not demonstrate a generally recognized causal connection between abortion and suicide,” ante at 671, even the evidence relied upon by Planned Parenthood acknowledges a significant, known statistical correlation between abortion and suicide. This well-documented statistical correlation is sufficient to sup *674 port the required disclosure that abortion presents an “increased risk” of-suicide, as that term is used in the relevant medical literature.
Among other disclosure requirements, the statute requires a physician to provide the following information to a patient seeking an abortion:
(e) A description of all known medical risks of the procedure and statistically significant risk factors to which the pregnant woman would be subjected, including:
(i) Depression and related psychological distress;
(ii) Increased risk of suicide ideation and suicide[.]
S.D.C.L. § 34-23A-10.1(l). Planned Parenthood does not contend that subsection (i), listing depression and related psychological distress as a known risk of abortion, is untruthful or misleading. Only subsection (ii), listing suicide and suicide ideation (collectively “suicide”), is at issue. To determine if the suicide advisory satisfies constitutional requirements for abortion regulations and compelled speech, I examine first what disclosure actually is required, second whether that disclosure is truthful, and third whether it is non-misleading and relevant to the patient’s decision to have an abortion. See Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 734-35 (8th Cir.2008) (en banc).
I.
With regard to the disclosure required, Planned Parenthood argues, and the district court agreed, that subsection (ii) must be construed to require a disclosure that abortion causes suicide. See Planned Parenthood Minn., N.D., S.D. v. Rounds, 650 F.Supp.2d 972, 982 (D.S.D.2009). However, no language in subsection (ii), or in the heading of section 10.1(l)(e), refers to causation. “The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used.” Langdeau v. Langdeau, 751 N.W.2d 722, 727 (S.D.2008) (quoting US West Commc’ns, Inc. v. Pub. Utils. Comm’n, 505 N.W.2d 115, 123 (S.D.1993)).
Here, the language actually used by the legislature denotes risk in a medical context: “medical risks,” “statistically significant risk factors,” “[ijncreased risk.” The term “risk” is not defined in the statute, and it has more than one reasonable definition. South Dakota law requires that such a term “must be construed according to its accepted usage, and a strained, unpractical or absurd result is to be avoided.” Peters v. Spearfish ETJ Planning Comm’n, 567 N.W.2d 880, 885 (S.D.1997). Based on what the legislature said, what must be disclosed is that suicide is a “risk” of abortion, applying the accepted usage of the term “risk” in the relevant medical field.
The Court examines no fewer than four medical dictionaries in its quest to find every possible definition of the term “risk,” and it finds that at least three of those definitions might be implicated in the advisory, some of which “may or may not denote causation.” Ante at 671. In my view, this approach sweeps far too broadly. Although the heading of subsection (e) refers to “all known medical risks of the [abortion] procedure,” the suicide advisory further incorporates the more precise phrase “[increased risk.” § 34-23A10.1(l)(e)(ii). As a result, one has to presume that the. term “increased risk” has a more precise meaning than the term “risk” by itself. See Maynard v. Heeren, 563 N.W.2d 830, 835 (S.D.1997) (“[N]o wordage should be found to be surplus. No provision can be left without meaning. If possible, effect should be given to every *675 part and every word.”) (quoting Cummings v. Mickelson, 495 N.W.2d 493, 500 (S.D.1993)); see also FCC v. AT & T Inc., — U.S. —, 131 S.Ct. 1177, 1183, 179 L.Ed.2d 132 (2011) (recognizing that, in construing a statute, “two words together may assume a more particular meaning than those words in isolation”). In practical terms, the advisory at issue is not applicable to every possible practice of medicine, and thus likely does not encompass every one of the numerous definitions of “risk” encountered in medical dictionaries. Instead, the “increased risk” advisory refers solely to the risk of suicide as it relates to those who undergo an abortion.[9] I therefore turn to the medical literature and expert evidence in the record to discern the accepted usage of the term “increased risk” in the applicable medical context, and in particular whether that accepted usage necessarily implies proof of causation.
The peer-reviewed medical literature in the record on the topic of suicide and abortion consistently uses the term “increased risk” to refer to a relatively higher probability of an adverse outcome in one group compared to other groups — that is, to “relative risk.” See ante at 670 (“ Relative risk’ refers to ‘the ratio of the risk of disease among those exposed to a risk factor to the risk among those not exposed.’”). For example, one study compared the rate of suicide for women who had received induced abortions with the rates of suicide for two other groups, women who gave birth and women who miscarried. See Ex. 60, Mika Gissler et al., Suicides After Pregnancy in Finland, 1987-9í, 313 Brit. Med. J. 1431, 1432 (1996), ECF No. 172-3. That study characterized its finding of a vastly higher suicide rate for women who received induced abortions as “an increased risk of suicide.” Id. at 1434. Another study compared the rate of, inter alia, suicide ideation in women who had received induced abortions with the rates for women who gave birth and for women who had not become pregnant. See Ex. 61, David M. Fergusson et al., Abortion in Young Women and Subsequent Mental Health, 47 J. Child Psychol. & Psychiatry 16, 19 (2006), ECF No. 172-4. That study characterized its finding of higher rates of adverse mental health outcomes for women who had induced abortions as “a detectable increase in risks of concurrent and subsequent mental health problems” for “young women expos[ed] to abortion.” Id. at 22 (emphasis added).
Finally, the following definition of risk in the medical context was provided by Intervenors’ expert, and is substantially in accord with the definitions of “absolute risk” and “relative risk” relied upon by the Court:
Assessment of degree of risk is often expressed in terms of absolute risk, which relates to the chance of developing a disease over a time-period (e.g., a *676 10% lifetime risk of suicide) or in terms of relative risk, which is a comparison of the probability of an adverse outcome in two groups. For example, abortion would be considered an increased risk for suicide if the relative risk is significantly higher for women who abort compared to women who give birth or never have children.
Coleman Decl. ¶ 6, Jul. 6, 2006, ECF No. 189 (emphases added).
Based on the “accepted usage” of the term in the relevant field, Peters, 567 N.W.2d at 885, the term “increased risk” in subsection (ii) indicates that the “relative risk” definition is the one intended by the legislature for the suicide advisory. Noticeably absent from the contextual definition of “increased risk” is a requirement for proof of causation. This stands to reason, because, as explained by the Intervenors’ expert:
When examining complex human psychological and physical health outcomes, such as depression and suicidal behavior, identification of a single, precise causal mechanism applicable to all situations is not possible....
Given this inherent complexity, sound epidemiological evidence is nevertheless derived by identifying those variables which are most strongly linked with adverse mental or physical health outcomes for large groups of individuals.
Coleman Decl. ¶¶ 5-6, Jul. 6, 2006. While such evidence of relative risk eventually may substantiate an inference of direct causation as further experiments rule out other plausible explanations, see id. at ¶ 9, conclusive proof of causation is not required in order for the identification of a medical risk.
Even the evidence upon which Planned Parenthood repeatedly relies (as does the Court today) is consistent with the “reíafive risk” definition of increased risk. For example, the report of the American Psychological Association’s (“APA”) Task Force on Mental Health and Abortion, Branson Decl. Ex. A, Sept. 8, 2008, ECF Nos. 283-3, 283^4 (hereinafter “APA Report”), decries the “tendency to confuse a risk and a cause” as a “logical fallacy.” APA Report at 31. As another example, Planned Parenthood submitted into the record a letter to a medical journal from one of the researchers mentioned above. While the researcher emphasized that his studies linking suicide and abortion did not prove causation, he resolutely reiterated his finding of “increased risk.” Mika Gissler et al., Letter to the Editor: Pregnancy-Related Violent Deaths, 27 Scand. J. Pub. Health 1:54, 55 (1999), ECF No. 206-10 (hereinafter “Gissler 1999”). It would be nonsensical for a study to find a relationship of “increased risk,” but not causation, if the term “risk” itself was understood to indicate a causal link.
Finally, Planned Parenthood submitted into the record the label approved by the Food and Drug Administration (“FDA”) for the abortion-inducing drug Mifeprex (mifepristone, also known as RU-486). The first paragraph of that label requires that the prescribing physician “inform the patient about the risk of these serious [listed] events,” but expressly states that “[n]o causal relationship between the use of Mifeprex and misoprostol and these events has been established.” Branson Decl. Ex. DD, at 1, Aug. 6, 2006, ECF No. 206-5 (emphasis added). Indeed, the FDA regulation governing that label requires that “[t]he labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved.” 21 C.F.R. § 201.80(e) (emphases added).[10] Once *677 again, it would be nonsensical for the FDA to require disclosure of “risks” in the absence of proof of a “causal relationship” if the term “risk” itself was understood to indicate a causal link.
In subsection (ii), the legislature required the disclosure of an “increased risk,” not causation. Based on the accepted usage of the term in the medical field, there is simply no support for the Court’s conclusion that the meaning of the term “increased risk” in the context of § 34-23A-10.1(l)(e)(ii) implies a disclosure of a causal relationship. Instead, subsection (ii) requires a disclosure simply that the risk of suicide and suicide ideation is higher for women who abort compared to women in other relevant groups, such as women who give birth or do not become pregnant.
II.
With regard to whether the required disclosure is truthful, see Rounds, 530 F.3d at 735, the State submitted into the record numerous studies published in peer-reviewed medical journals that demonstrate a statistically significant correlation between abortion and suicide. The studies were published in respected, peer-reviewed journals such as the Obstetrical and Gynecological Survey, the British Medical Journal, the Journal of Child Psychology and Psychiatry, the Southern Medical Journal, and the En/ropean Journal of Public Health. These journals rely on multiple independent expert reviewers to identify flaws in a study’s data and methods before publication, and there is no indication that the peer-review process was not followed for the studies at issue. While Planned Parenthood argues that these studies do not examine the correlation between abortion and suicide in sufficient detail to prove causation (as discussed in more detail in Part III), there is nothing in the record to suggest that the underlying data or calculations in any of these studies are flawed. For example, Planned Parenthood’s own expert admitted that one of the studies, which determined a suicide rate after abortion of 31.9 per 100,-000 as compared to a suicide rate after live birth of 5.0 per 100,000, “indicates an association; not causation, but an association” between abortion and suicide. Stotland Dep. 283:22-284:9, ECF No. 152-12.[11] When asked if she had “any quarrel with the validity of that association,” the expert replied that she did not. Id. at 284:11-13.
Based on the record, the studies submitted by the State are sufficiently reliable to support the truth of the proposition that the relative risk of suicide and suicide ideation is higher for women who abort their pregnancies compared to women who give birth or have not become pregnant. It also is worth repeating that Planned Parenthood does not challenge the disclosure that abortion may lead to “[djepression and related psychological distress.” S.D.C.L. § 34-23A-10.1(l)(e)(i); see also Gonzales v. Carhart, 550 U.S. 124, 159, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) (stating that “[sjevere depression and loss of esteem can follow” an abortion). As a matter of common sense, the onset of depres *678 sion and psychological distress also would increase one’s risk of suicide and suicide ideation. See, e.g., Ottar Bjerkeset et al., Gender Differences in the Association of Mixed, Anxiety and Depression with Suicide, 192 Brit. J. Psychiatry 474, 474 (2008) (“Depression is thought, to be the most important antecedent of suicide.... ”). Thus, there appears to be little dispute about the truthfulness of the required disclosure.[12]
III.
Despite the extensive evidence in the record of an “increased risk” of suicide, Planned Parenthood contends that disclosure of the increased risk would be misleading or irrelevant to a patient seeking an abortion, see Rounds, 530 F.3d at 735, because certain authorities have indicated that there is no direct causal link. In particular, Planned Parenthood argues that certain underlying factors, such as preexisting mental health problems, predispose some women both to have unwanted pregnancies and to have suicidal tendencies, resulting in a misleading correlation between abortion and suicide that has no direct causal component. Under this view, the required disclosure would be misleading or irrelevant to the decision to have an abortion because the patient’s decision would not alter the underlying factors that actually cause the observed increased risk of suicide.
As an initial matter, I note that the usual medical practice reflected in the record is to recognize a strongly correlated adverse outcome as a “risk” while further experiments are conducted to confirm or exclude other plausible causes. See, e.g., Coleman Decl. of Jul. 6, 2006 (Dkt. # 189), ¶ 9. In contravention of that usual practice, Planned Parenthood argues that the existence of other plausible causes proscribes the disclosure of suicide as a risk of abortion. There is no constitutional requirement to invert the traditional understanding of “risk” by requiring, where abortion is involved, that all other plausible explanations be ruled out first. Indeed, the Supreme Court “has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty,” and “[m]edical uncertainty does not foreclose the exercise of legislative power in the abortion context any more than it does in other contexts.” Gonzales, 550 U.S. at 163-64, 127 S.Ct. 1610. In particular, “a requirement that a doctor give a woman certain information as part of obtaining her consent to an abortion is, for constitutional purposes, no different from a requirement that a doctor give certain specific information about any medical procedure.” Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 884, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). There is no basis in the “non-misleading” and “relevant” requirements of Casey for imposing a new, stricter definition of medical risk — a standard that requires certainty of causation — simply because the medical procedure at issue is abortion.
*679 Thus, the truthful disclosure regarding increased risk cannot be unconstitutionally misleading or irrelevant simply because of some degree of “medical and scientific uncertainty,” Gonzales, 550 U.S. at 163, 127 S.Ct. 1610, as to whether abortion itself plays a causal role in the observed correlation between abortion and suicide. Instead, Planned Parenthood would have to show that any “medical and scientific uncertainty” has been resolved into a certainty against any causal role for abortion. In other words, in order to render the suicide advisory unconstitutionally misleading, Planned Parenthood would have to show that abortion has been ruled out, to a degree of scientifically accepted certainty, as a statistically significant causal factor in post-abortion suicides. An examination of Planned Parenthood’s evidence reveals that it cannot meet this burden.
First, Planned Parenthood points out that the scope of the FDA labeling regulations discussed above would appear to require a warning of increased risk of suicide for the abortion-inducing drug Mifeprex, if that risk were indeed valid. Because the actual label approved by the FDA does not include such a warning, Planned Parenthood argues that the FDA must have found that the increased risk of suicide after an abortion is not valid. However, an FDA-approved label does not represent the definitive or exclusive list of risks associated with a drug, because “[t]he FDA has limited resources to monitor the 11,000 drugs on the market, and manufacturers have superior access to information about their drugs.” Lefaivre v. KV Pharm. Co., 636 F.3d 935, 940-41 (8th Cir.2011) (quoting Wyeth v. Levine, 555 U.S. 555, 578-79, 129 S.Ct. 1187, 1202, 173 L.Ed.2d 51 (2009)). Moreover, the record before us does not show whether any evidence of the link between abortion and suicide was submitted to the FDA, nor does it provide details of the FDA’s analysis, if any, of the link. Thus, the FDA-approved label for Mifeprex yields no information as to whether abortion has been ruled out as a statistically significant causal factor in post-abortion suicides.
Second, Planned Parenthood argues, and the district court found, that the American College of Obstetricians and Gynecologists (“ACOG”), a well-known professional medical organization, “rejects any suggestion that increased risk of suicide and suicide ideation are known risks of abortion.” 650 F.Supp.2d at 983. Unfortunately, there was no evidence from ACOG in the record for the district court to consider. The only evidence in the record pertaining to ACOG’s position is a second-hand reference in a 2005 report by the State’s expert, Dr. Elizabeth M. Shadigian, that quoted two sentences from a single ACOG Practice Bulletin: “Long-term risks sometimes attributed to surgical abortion include potential effects on ... psychological sequelae. However, the medical literature, when carefully evaluated, clearly demonstrates no significant negative impact on any of these factors with surgical abortion.” Elizabeth M. Shadigian, Report to the S.D. Task Force to Study Abortion 4, Sept. 21, 2005, ECF No. 177-4 (hereinafter “Shadigian Report”); see also Ex. O, Shadigian Dep. 137-38, ECF No. 147-15 (quoting the recitation of those lines in the Shadigian Report). Dr. Shadigian further reported her opinion that ACOG’s statement was erroneous and that “ACOG seems to claim that they have adequately evaluated the medical literature, but they do not consider our study or the many other studies we evaluated.” Shadigian Report at 5. There is no other evidence in the record as to what “medical literature” ACOG considered, in what fashion it was “carefully evaluated,” whether suicide was one of the “psychological sequelae” considered, whether ACOG’s analysis received any independent peer review, or indeed whether a “Practice Bulle *680 tin” purports to be any sort of reliable scientific authority at all. The two unsupported sentences from an ACOG Practice Bulletin lend no credence to the argument that abortion has been ruled out as a statistically significant causal factor in post-abortion suicides.
Third, Planned Parenthood cites the previously mentioned APA Report. The six-person Task Force on Mental Health and Abortion that authored the APA Report reviewed “50 papers published in peer-reviewed journals between 1990 and 2007 that analyzed empirical data of a quantitative nature on psychological experiences associated with induced abortion, compared to an alternative.” APA Report at 64. For some of the studies that found increased mental health risks associated with abortion, the APA Report identifies perceived methodological deficiencies, including an inability to limit the comparison group to women who carried unplanned or unwanted pregnancies to term. See id. at 68. Based on one study that attempted to account for that variable, the report states that “the best scientific evidence indicates that the relative risk of mental health problems among adult women who have an unplanned pregnancy is no greater if they have an elective first-trimester abortion than if they deliver that pregnancy.” Id. (emphases in original). In the very same sentence, however, the report admits that the published literature could not provide “unequivocal evidence regarding the relative mental health risks associated with abortion per se compared to its alternatives (childbirth of an unplanned pregnancy).” Id.
The State and Intervenors argue that the APA Report is deficient in several respects. While the APA Report alleges methodological flaws in all of the studies that found a strong link between abortion and adverse mental health outcomes, it does not systematically list or analyze those flaws for each study considered. Instead, the report uses a handful of studies as illustrative examples. The State and Intervenors contend that this lack of rigor allowed the APA Report to analyze studies that found abortion to be “a benign experience for most women” less stringently than studies showing that abortion caused adverse effects. Coleman Deck ¶ 14, Sept. 16, 2008, ECF No. 290-3. For example, while the APA Report suggests that the studies showing increased risk did not compare women receiving abortions to women who carried unplanned pregnancies to term, at least three studies purportedly considered by the task force did use such a control group, and each of those studies still “definitively indicated that abortion was associated with more mental health problems.” Id. at ¶ 19. The APA Report also does not acknowledge that some of the studies showing increased risk did statistically control for other potential causal factors such as history of depression, anxiety, suicide ideation, childhood sexual abuse, physical abuse, child neuroticism, and low self-esteem. Id. at ¶ 15(c). As another example, although a high rate of attrition (i.e., the loss of subjects from a long-term study before the study is complete) is typically regarded as a methodological weakness, the APA Report downplays the significance of attrition, possibly because “the studies with the highest attrition rates [as high as 60%] ... are also the ones that provide little evidence of negative effects” of abortion. Id. at ¶ 15(d). A number of published authors in the field contacted the APA to point out these problems and ask that the APA Report be retracted. Id. at ¶¶ 28-29.
At a minimum, it appears that many published authors in the field do not accept the opinion of the APA’s six-person task force that the “best evidence” suggests that there is no real significance to the link between abortion and suicide. However, *681 for purposes of the discussion that follows, I will accept the findings in the APA Report at face value. The crux of the matter is that while the APA Report states that the evidence available at the time of its review is not “sufficient to support the claim that an observed association between abortion history and mental health was caused by the abortion,” id. at 6 (emphasis added), it also concludes that the published literature is inconclusive and more research is needed “to disentangle confounding factors and establish relative risks of abortion compared to its alternatives,” id. at 72; see also id. at 68 (admitting that the published literature could not provide “unequivocal evidence regarding the relative mental health risks associated with abortion per se compared to its alternatives (childbirth of an unplanned pregnancy)”).
In other words, while the APA Report finds that studies to date have not established with certainty that abortion is a causal factor in post-abortion suicide, it also acknowledges that abortion has not been ruled out as a causal factor and that better-designed studies would be needed to do so.[13] Thus, the APA Report provides no support for the proposition that abortion has been ruled out as a statistically significant causal factor in post-abortion suicides.
In short, although the record reflects some degree of “medical and scientific uncertainty,” Gonzales, 550 U.S. at 163, 127 S.Ct. 1610, as to whether abortion itself is a causal factor in the observed correlation between abortion and suicide, there is nothing in the record to suggest that abortion as a cause per se has been ruled out with certainty. As a result, the disclosure of that correlation as an “increased risk” is not unconstitutionally misleading or irrelevant under Casey and Gonzales.[14]
*682 As a final matter, I address the Court’s more general contention that “nothing in the advisory would prevent the unproven inference that the ‘increased risk’ mentioned in [the statute] is increased by abortion.” Ante at 671. To the contrary, physicians who provide abortions should be capable of reviewing the research in the field, understanding the difference between relative risk and proof of causation, and explaining it correctly to their patients, just as they should be capable of explaining the biological nature of the “human being” advisory. See Rounds, 530 F.3d at 736 (“The State’s evidence suggests that the biological sense in which the embryo or fetus is whole, separate, unique and living should be clear in context to a physician.”). Rather than “constraining]” or “overriding” a physician’s professional judgment, as the Court suggests, ante at 672, 672-73, the statute actually relies on the physician’s judgment to present the underlying research in the field accurately. While the Court attempts to paint this requirement as extremely controversial, even some researchers who are skeptical of abortion’s causal role nevertheless advocate disclosure of the increased risk of suicide to abortion patients. See Gissler 1999 at 55 (rejecting the idea that “an induced abortion in itself causes ... suicide risk,” but stating that “[t]he fact that some women who have an induced abortion are at risk for violent death [including suicide] within a year after the procedure should be acknowledged in the provision of abortion services.”).
Accordingly, I would hold that the suicide advisory is not only truthful, but also non-misleading and relevant to the patient’s decision to have an abortion.
IV.
In conclusion, I would hold that the requirements of S.D.C.L. § 34-23A-10.1(l)(e)(ii) are satisfied by a disclosure that the relative risk of suicide and suicide ideation is higher for women who abort compared to women in other relevant groups, as described in the relevant medical research. The statute does not require the physician to disclose that a causal link between abortion and suicide has been proved. The disclosure is truthful, as evidenced by a multitude of studies published in peer-reviewed medical journals that found an increased risk of suicide for women who had received abortions compared to women who gave birth, miscarried, or never became pregnant. Various studies found this correlation to hold even when controlling for the effects of other potential causal factors for suicide, including pre-existing depression, anxiety, suicide ideation, childhood sexual abuse, physical abuse, child neuroticism, and low self-esteem.
Moreover, the suicide advisory is non-misleading and relevant to the patient’s decision to have an abortion, as required by Casey. The standard medical practice is to inform patients of significant risks that have been associated with a procedure through medical research, even if causation has not yet been proved. While Planned Parenthood points to uncertainty as to whether abortion itself is a causal factor in the observed correlation to suicide, as opposed to other factors that tend to be associated independently with both abortion and suicide, the Supreme Court *683 “has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty,” including “in the abortion context.” Gonzales, 550 U.S. at 163-64, 127 S.Ct. 1610. Thus, a truthful disclosure cannot be unconstitutionally misleading or irrelevant simply because some degree of medical and scientific uncertainty persists. To be sure, informed consent requirements “must be calculated to inform [a] woman’s free choice, not hinder it,” ante at 673 (quoting Casey, 505 U.S. at 877, 112 S.Ct. 2791), but there is no unconstitutional hindrance on the woman’s choice where, as here, the State merely is using “its regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient’s decision to have an abortion, even if that information might also encourage the patient to choose childbirth over abortion,” Rounds, 530 F.3d at 735. I would hold that, on its face, the suicide advisory presents neither an undue burden on abortion rights nor a violation of physicians’ free speech rights.
Accordingly, I respectfully dissent from the Court’s holding in Part II. C.

. The Court trivializes this distinction by noting that any type of medical "risk” can be "increased” or decreased, see ante at 670-71, and by finding that the state legislature did not use the word "risk” with any "technical precision,” ante at 671 (agreeing with the district court "that the legislative drafters 'may not have fully understood the meaning of this phrase as used in the medical profession' ”). Yet, if the legislature had intended the trivial meaning envisioned by the Court, it would have had no reason to use the term "increased risk” in the suicide advisory alone, rather than throughout subsection (e). For example, unlike the suicide advisory, the advisory regarding the risk of depression does not expressly state that it is an “increased risk,” nor in fact does it reiterate any form of the term "risk” at all. See § 34 — 23A10.1(l)(e)(i). Ironically, by refusing to adopt a construction of the term “increased risk” that gives effect to every word of the statute, it is the Court, rather than the state legislature, that fails to distinguish with any technical precision among the many possible meanings of the term "risk.”

. The quoted language formerly appeared in 21 C.F.R. § 201.57(e) (superseded June 30, 2006), under which the Mifeprex label was *677 approved on September 28, 2000. See Bran-son Decl. Ex. CC, Aug. 6, 2006, ECF No. 206-4. The requirements of former § 201.57 now appear in 21 C.F.R. § 201.80 and remain applicable to prescription drugs approved by the FDA prior to June 30, 2001, with certain exceptions. See 21 C.F.R. § 201.56(b).

. With regard to another potential comparison group, the cited study also determined a suicide rate among women of reproductive age who did not become pregnant as in the range of 11.8 to 13.3 per 100,000. See Mika Gissler et al., Injury Deaths, Suicides and Homicides Associated with Pregnancy, Finland 1987-2000, 15 Eur. J. Pub. Health 5:459, 460 (2005), ECF No. 147-18.

. Planned Parenthood also contends that the statute is invalid because an increased risk of suicide after abortion is not "known” as required by the statute. See S.D.C.L. § 34-23A-10.1(l)(e) (requiring disclosure of "[a]ll known medical risks of the procedure”). This contention was premised on Planned Parenthood’s argument that "increased risk” implies causation and that such a causal link is not generally "known.” Because the statute does not require disclosure of any causal link, Planned Parenthood’s argument on this point is misdirected. The record indicates that the disclosure actually required — that the relative risk of suicide and suicide ideation is higher for women who abort compared to women in other relevant groups — is generally "known.” For example, the APA commissioned a task force to produce the 91-page APA Report for the sole purpose of analyzing that known risk in more detail. See APA Report at 5.

. The Court cites the APA Report for the proposition that "it is not possible to talk about any effect of abortion on suicide risk” without conclusive comparison data for "women who carry unwanted pregnancies to term.” Ante at 672. The Court does not explain by what authority the APA has become the sole arbiter of the discussion. To the extent the Court holds that the state legislature may not enact, and the federal courts may not affirm, policies that “contradict! ] ... the leading associations of experts in relevant fields,” ante at 673, I note that the Supreme Court has squarely rejected this contention. Compare Gonzales, 550 U.S. at 166, 127 S.Ct. 1610 ("Considerations of marginal safety, including the balance of risks, are within the legislative competence when the regulation is rational and in pursuit of legitimate ends.”) with Gonzales, 550 U.S. at 176, 127 S.Ct. 1610 (Ginsburg, J., dissenting) (noting that the legislature’s chosen balance contradicted "statements from nine professional associations, including ACOG,” while "[n]o comparable medical groups supported” the legislature's position).
By attributing such unwarranted authority to the APA in this case, it appears that the Court has muted any "possible [] talk” about the issue for the foreseeable future. While the APA waits for methodologically perfect research on the effect of "unwanted” or "unplanned” pregnancies, others have found such perfection is not achievable, because "pregnancies that are aborted frequently were initially intended by one or both partners and pregnancies that are initially unintended often become wanted as the pregnancy progresses, rendering assessment of wantedness/intentedness [sic] subject to considerable change over time.” Coleman Deck ¶ 15, Jul. 6, 2006, ECF No. 189. In addition, "pregnancy wantedness/intentedness is open to multiple subjective interpretations.” Id. at ¶ 16. The APA Report does not specify what sort of data on these variables would be acceptable to resolve the issue to the APA's satisfaction, and the report even seems to conflate the entirely separate concepts of whether a pregnancy is "wanted” and whether it was initially “planned” or "intended.” See, e.g., APA Report at 64 (“These studies were evaluated with respect to their ability to draw sound conclusions about the relative mental health risks associated with abortion compared to alternative courses of action that can be pursued by a woman facing a similar circumstance (e.g., an unwanted or unintended pregnancy).”).

. Although the issue is not presented, I would not preclude the possibility that a State could have an interest in requiring that a patient seeking an abortion be informed of risks that correlate with abortion, even if abortion were ruled out as a causal element. If an adverse event correlates with abortion solely due to the effect of independent underlying factors, a State nevertheless might wish to provide a warning to a patient who seeks an abortion, on the likelihood that the patient also shares the underlying causal factors.